UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

KATHY MULLALLEY                                                                              PLAINTIFF

v.                                                                        CIVIL ACTION NO. 3:12-CV-332-S

MICHAEL J. ASTRUE, Commissioner of Social Security Administration            DEFENDANT

**FINDINGS OF FACT
CONCLUSIONS OF LAW
AND RECOMMENDATION**

    Plaintiff Kathy Mullalley has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain judicial review of a final decision of the Commissioner of Social Security that denied her application for disability insurance benefits (DIB) and supplemental security income (SSI) (DN 1).  Mullalley applied for DIB and SSI on Dec. 11, 2008 (Tr. 106, 117), alleging that she became disabled on July 30, 2007, due to stomach trouble, peripheral artery disease, anxiety, panic attacks and depression (Tr. 122).  The Commissioner denied her application on initial review (Tr. 90, 92-95) and on reconsideration (Tr. 91, 97-99).  Mullallaey requested a hearing before an Administrative Law Judge (ALJ) (Tr. 100-101).

    ALJ  D. Lyndell Pickett conducted a hearing in Louisville, Kentucky, on Dec. 29, 2010 (Tr. 24-53).  Mullalley attended with her representative, John Sharpensteen (Tr. 23).  She and vocational expert (VE) Tina Stambaugh testified at the hearing (Tr. 27-46, 47-52).  On January 12, 2011, ALJ Pickett entered a hearing decision that found Mullalley to be not disabled at step 5 of the sequential evaluation process (Tr. 11-19).  In his decision, ALJ Pickett made the following findings of fact:

  1.  The claimant last met the insured status requirements of the Social Security Act on June 30, 2008.

  2.  The claimant did not engage in substantial gainful activity during the period from

    her alleged onset date of July 30, 2007, through her date last insured of June 30, 2008 (20 C.F.R. 404.1571, *et seq.*).

3.  Through the date last insured, the claimant had the following severe impairments: status post-right iliac stent placement, hernia repair and anxiety (20 C.F.R. 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except she is limited to routine and repetitive, unskilled work which does not require interaction with the general public.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. 404.1565).

7.  The claimant was born on Nov. 21, 1955, and was 52-years-old, which is defined as an individual closely approaching advanced age on the date last insured (20 C.F.R. 404.1563).

8.  The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appx. 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity (RFC), there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1569 and 404.1569(a)).

11.  The claimant was not been under a disability, as defined in the Social Security Act, at any time from July 30, 2007, the alleged onset date, through June 30, 2008, the date last insured (20 C.F.R. 404.1520(g)).

(Tr. 13-18).

Mullalley requested review of the hearing decision by the Appeals Council (Tr. 7). The Council determined that no basis existed to grant her request (Tr. 1-3). She then filed the present lawsuit. Both Mullalley and the Commissioner have filed a fact and law summary (DN 11, 12). The administrative record has been filed (DN 9). Accordingly, the issues related to Mullalley's DIB and SSI claims are now ripe for consideration.

**Disability Review Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See, 20 CFR §§ 404.1505, 416.905(a). To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed. 20 CFR §§ 404.1520, 916.920(a). At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled. See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971. *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities. See 20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant

3

will be determined to be not disabled at step 2. *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart P of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii). The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who can not return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir.

1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, requires a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the

federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**The Issue Raised.**

Mullalley in her fact and law summary challenges findings of fact nos. 5, 9, 10 and 11 of the hearing decision (Tr. 14, 17-18). In particular, she focuses her sole argument on findings of fact no. 5 and 9 in which ALJ Pickett finds that (1) she retains the RFC to perform light work as defined by 20 C.F.R. 404.1567(b),[1] and that (2) using the Medical-Vocational Rules as a framework supports the finding that she is not disabled, regardless of her transferable job skills (Tr. 14, 17).

Mullalley maintains that substantial evidence does not support either of these two particular findings because the administrative record reveals that she is significantly limited in her ability to lift due to severe abdominal pain. This pain she explains is caused by the intertwining of a surgical mesh and her intestines, which occurred after she had hernia repair surgery performed in 2007 (Tr. 30, 184, 188-89). The pain, according to Mullalley, limits her to lifting no more than 5 lbs. frequently. Such a lifting limit would exclude light work under 20

---

[1] Under the regulation, "light work" is defined to involve lifting no more than 20 lbs. at a time with frequent lifting or carrying of objects weighing up to 10 lbs. 20 C.F.R. § 404.1567(b). A job in the light exertional category requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls." *Id.* For a claimant to be considered capable of performing a full or wide range of light work, the claimant must have the ability to do substantially all such activities. *Id.*

C.F.R. §404.1567(b) and would reduce her exertional capacity to performing only sedentary work as defined by 20 C.F.R. §404.1567(a).[2]  Mullalley concludes that, given her age, education level, past relevant work and sedentary RFC, application of the Medical-Vocational Rules, or "Grids," directs a finding of disability[3] under Grid rule 201.14 of 20 C.F.R. Part 404, Subpart P, App. 2.

**Background Information.**

Mullalley was born Nov. 21, 1955, making her 55 years old at the time of the hearing before ALJ Pickett (Tr. 27, 106).  She has a highschool education and a certificate in cosmetology, but no recent work experience as hair stylist (Tr. 27).  Her past relevant work includes employment as a part-time cashier at a discount store and gas station (Tr. 123).  Prior to working as a cashier, Mullalley worked as a delivery person for a florist, a hairdresser and a secretary (*Id*.).  Her longest employment, from 1993 to 1998, was as a hair stylist (*Id*.).

Review of Mullalley's medical records reveals a history of treatment at Norton

---

[2] Sedentary work under the regulation involves lifting no more than 10 lbs at any time and occasionally lifting or carrying items such as files, ledgers and small tools.  See 20 C.F.R. Section 404.1567(a).  A sedentary job primary involves sitting, although a certain amount of walking and standing is occasionally necessary

[3] Mullalley in her fact and law summary on p. 8 appears to have made a typographical error as she states that taking into her account her proper RFC, age, education level, and difficulty of her past work, applying Grid Rule 201.14 would direct a finding of "not disabled." (DN 11, p. 8). This statement cannot be reconciled with the immediately following sentence which provides that, "Had the ALJ properly identified Ms. Mullalley's RFC as sedentary and properly applied the grid rules, Ms. Mullalley would have been found disabled." (*Id*). Mullalley obviously argues that given her true exertion limitation to sedentary work, application of grid rule 201.14 would result in a finding of disability.

7

Audubon Hospital for severe occlusive artery disease that manifested with a critical stenosis[4] of the distal common iliac artery[5] extending into the external iliac artery[6] (Tr. 317). This condition resulted in a catheterization and stent[7] placement procedure performed by Dr. Thomas Klamer on Feb. 23, 2005 (Tr. 317-318).

When Mullalley later returned to Dr. Klamer on Sept. 7, 2005, the doctor reported she had "done very well with regard to her lower extremities (Tr. 302). Mullalley was reported to be "ambulating without difficulty," but was noted to continue to smoke. Her physical examination notes on that date reflect that she had undergone a total abdominal hysterectomy since March of that year "and has done very well from that." (*Id*.). Overall, Dr. Klamer concluded that Mullalley "has gotten a very good result from her angioplasty...." (*Id*.).

Mullalley did not return to Dr. Klamer until 2.5 years later on Dec. 17, 2008, with vague complaints of "heaviness" in her legs. (Tr. 298). Dr. Klamer's examination, however, failed to reveal any symptoms of claudication[8] and Mullalley's "nondescript" symptoms were

---

[4] Stenosis is defined to be a "stricture; an abnormal narrowing or contraction of a duct or canal." See http://medical-dictionary.thefreedictionary.com/stenosis (last visited Dec. 19, 2012).

[5] "The common iliac arteries are two large arteries that originate from the aortic bifurcation at the level of the fourth lumbar vertebra. They bifurcate into the external iliac artery and internal iliac artery" http://en.wikipedia.org/wiki/Common_iliac_artery (last visited Dec. 19, 2012).

[6] "The external iliac arteries are two major arteries which bifurcate off the common iliac arteries anterior to the sacroiliac joint of the pelvis." http://en.wikipedia.org/wiki/External_iliac_artery (last visited Dec. 19, 2012).

[7] A stent is "a tube designed to be inserted into a vessel or passageway to keep it open." http://www.medterms.com/script/main/art.asp?articlekey=5554 (last visited Dec. 19, 2012).

[8] Claudication is "pain, tension, and weakness in the legs on walking, which intensifies to produce lameness and is relieved by rest; it is seen in occlusive arterial disease." http://medical-dictionary.thefreedictionary.com/claudication (last visited Dec. 19, 2012).

not related to any activity.  Consequently, the doctor concluded that Mullalley "does not appear to have any significant peripheral vascular disease...." (Id.).  The doctor continued to remain concerned, however, about Mullalley's persistent smoking (Tr. 298).  When Mullalley returned again two years later on Feb. 24, 2010, she complained only of numbness in her legs after long periods of sitting (Tr. 295).  Dr. Klamer reassured her that her symptoms were neurologic; otherwise, he found her to be doing well and to be asymptomatic for peripheral vascular disease (*Id.*).

In addition to placement of the iliac stent in February of 2005, Mullalley also underwent a laproscopic incisional hernia repair in December of 2006. The surgical procedure was performed by Dr. Paul A. Rafson (Tr. 252-53, 286).  By one month post-operatively, Dr. Rafson reported Mullalley to be doing well and "recovering uneventfully so far," although the doctor noted that her "fascial[9] defect turned out to be somewhat larger than first appreciated." (Tr. 285).  Unfortunately, by Sept. 11, 2008, Mullalley was reporting right-sided abdominal pain that was present for several months (Tr. 283-84).

Dr. Stephen Kelty of Louisville General Surgery noted that a CT scan at that time was fairly unremarkable.  Mullalley described her pain to Dr. Kelty as being "a hot burning type of discomfort like she had a hot brick in her abdomen." (Tr. 283).  She also reported "pinprick type sensations around her abdomen" with her symptoms being unrelated to meals.  Otherwise,

---

[9] The fascia is " a sheet or band of fibrous connective tissue enveloping, separating, or binding together muscles, organs, and other soft structures of the body."
http://www.thefreedictionary.com/fascial (last visited Dec. 19, 2012).

Mullalley reported that her general health was good. (*Id*.). She related a prior surgical history of a C-section, cholecystectomy, hysterectomy and laproscopic heniorrhaphy. (*Id*.). Her only reported medications included Plavix, Aspirin, Alprazolam and Dicyclomine (*Id*.).

Dr. Kelty's review of Mullalley's symptoms proved to be unremarkable, and she denied any fever, weight loss, chest pain, shortness of breath, heartburn or bleeding problems. (Id.). Mullalley did report smoking two packs of cigarettes a day. Dr. Kelty expressed his desire to further evaluate Mullalley's abdominal complaints with a colonoscopy and CT scan (Tr. 284). A prior CT scan of Mullalley's abdomen and pelvis confirmed her surgical history of cholecystectomy, hysterectomy and ventral hernia repair, but was otherwise within normal limits with no acute diagnostic abnormality (Tr. 251).

Treatment notes from the Norton Medical Associates of Shepherdsville reflect that Mullalley appeared on Aug. 29, 2008, with complaints of a burning pain in the right side of her stomach for approximately one week (Tr. 238)[10]. She returned to Norton Medical Associates on Jan. 23, 2009, at which time she was observed to be "very emotional" and complained of feeling depressed all the time (Tr. 237). Mullalley made no specific complaints of abdominal pain on that date , only complaints of depression, fatigue and headache (Tr. 237). She did not return to Norton Medical Associates until six months later on July 21, 2009, for a checkup on her anxiety-related problems (Tr. 236). The final treatment note from Norton Medical Associates dated Feb. 24, 2010, reports that Mullalley on that occasion returned for a prescription refill (Tr.

---

[10] The same treatment notes suggest that Mullalley was prescribed some unknown medication for her abdominal pain. (Tr 238). Unfortunately, the treating physician's handwriting is illegible. An adult disability report dated Dec. 30, 2008 identifies no pain medications in the claimant's current medication list (Tr 126).

235). She made no complaints of significant pain, but did report poor sleep and a warm feeling under her right axilla, or arm pit (*Id*.).

Although Dr. Kelty in September of 2008, had encouraged Mullalley to undergo a colonoscopy and CT scan to further evaluate her complaints of abdominal pain, which Dr. Kelty considered possibly related to irritable bowel disease or residual discomfort due to mesh hernia repair, Mullalley on Sept. 6, 2008, elected to postpone the colonoscopy so that she could take advantage of an opportunity to travel (Tr. 184). Mullalley advised Dr. Kelty that she would call him when she returned from her trip to reschedule the procedure (*Id*.).

Mullalley testified at the administrative hearing that she became disabled on July 30, 2007 (Tr. 29). At that time, she had been working part-time as a cashier at the Family Dollar Store, but became unable to continue her employment because she "couldn't do any lifting...." (Id.). Mullalley identified her inability to life as being her worst medical problem, which she attributed to the mesh from her hernia repair surgery becoming adhered to her intestines (Tr. 30). As she explained the matter, her "lower bowel [i]s entangled in the hernia and [she has] ... another hernia now above all the mesh." (Id). In addition to her hernia-related inability to lift, Mullalley also testified to frequent panic attacks, along with peripheral arterial disease causing recent problems in her arms (Id.).

She complained of limitations in her ability to sit for extended periods, and reported having to sit with her legs propped up to waist height approximately every half hour during the day (Tr. 31). She also explained that due to the pain related to her hernia repair complications she must lie down during the day in the afternoon at least four times a week for several hours(Tr. 32). As for her panic attacks, Mullalley testified that they started seven years

prior to the hearing while her son was serving in the military in Iraq (Tr. 33). Mullalley did briefly seek treatment with a psychiatrist, Dr. Hamilton, and was prescribed Xanax, .50 mg a day. She also was treated with Trazodone (*Id*.). Despite her treatment with medication, Mullalley reported that she still experiences at least one panic attack daily, which resolves quickly with Xanax (Tr. 34). Due to her anxiety treatment, Mullalley has difficulty concentrating and does not enjoy reading novels like she used to do (Tr. 34-35). She also is more easily distracted (Tr. 35).

Due to her abdominal pain, Mullalley also reported she is unable to clean her home as she did in the past. She can not vacuum without difficulty because her abdomen will begin hurting (Tr. 36). She seldom cooks anymore, despite her love of cooking (*Id*.). When she recently carried some firewood into the house, she experienced significant pain the following day (*Id*.). Mullalley estimated that she can perform household chores for thirty minutes before she must sit down and rest, except for vacuuming, which she can only do for approximately 15 minutes due to the push and pull motion involved (Tr. 37).

Mullalley estimated that in an 8-hour day, she would be able to sit for four hours, stand for two hours, and walk for four or five hours (Tr. 37-38). She testified that she can lift a 5-lb. bag of sugar, but picking up her 25-lb. grandson causes her extreme pain (Tr. 38). She described her abdominal pain as being located on her right side, a warm, burning, dull pain that is constant (Tr. 38-39). On a scale of one to ten, she estimated her abdominal pain to be a level five out of ten (Tr. 39). Mullalley explained that she can "tolerate pain pretty well," although her abdominal pain increases to a level 7 approximately once a week (*Id*.). On those occasions, she must lie down for about four hours (Tr. 40).

12

Mullalley also has difficulties being around large groups of people (Tr. 40). She explained that she has occasions on a regular basis when she just does not want to leave her home (*Id*.). Nevertheless, Mullalley does have a driver's license and drives approximately twice a week to the convenient store to purchase cigarettes (Tr. 41). In completing her testimony, Mullalley explained that she left her final employment at the Family Dollar Store after her employer wanted her to help unload delivery trucks, and she just could not do the lifting (Tr. 45-46). Finally, she concluded that her abdominal pain has gradually gotten worse over time, as well as her depression (Tr. 46).

**Findings of Fact 5, 9 and 10.**

Mullalley as noted above focuses her fact and law summary essentially on a single argument. She insists that the decision of the ALJ that she retains the RFC to perform light exertional work is not supported by substantial evidence given her self-reported limitation to lifting no more than 5 lbs. regularly. She consequently claims that she is limited to sedentary work. When her age, education, past relevant work and correct RFC are all taken into consideration, Mullalley concludes that she should have been found to be disabled based upon the application of the Medical-Vocational Rules, or "Grids," based on Rule 201.14 of 20 C.F.R. Part 404, Subpart P, App. 2. Under Rule 201.14, a claimant who is closely approaching advanced age, with a highschool education and previous work experience limited to unskilled or no prior work, whose RFC is limited to sedentary work, will be administratively assumed to be incapable to engage in substantial gainful activity.

The Medical-Vocational Rules are an administrative aid or short-cut that under

certain specific circumstances will permit the Commissioner to take administrative notice of the existence of a substantial number of jobs in the national economy that a claimant-- whose age, education, past relevant work and RFC match the characteristics of a particular rule-- remains capable of performing. See *Abbott v. Sutherland*, 905 F.2d 918, 926-927 (6th Cir. 1990) (citing *Kirk v. Sec'y of HHS*, 667 F.2d 524, 529 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983)). The grids may be exclusively relied on to satisfy the Commissioner's burden of proof of step 5 of the sequential evaluation process in those instances in which the claimant suffers from exertional limitations that affect his or her ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing and pulling). *Jordan v. Comm'r*, 548 F.3d 417, 422-25 (6th Cir. 2008) (citing *Abbott v. Sutherland*, 905 F.2d 918, 926-27 (6th Cir. 1990)).

      The Commissioner may not rely on the grids alone to meet his burden at step 5 in those instances in which a claimant has non-exertional impairments that preclude him or her from performing a full range of work at a given exertional level. *Id*. (citing *Damron v. Sec'y of HHS*, 778 F.2d 279, 282 (6th Cir. 1985)). In such situations, where a claimant has non-exertional impairments alone, or in combination with exertional impairments, that preclude the performance of a full range of work, then the ALJ must treat the grids as being only a "framework for decision making." The ALJ must then take into account other evidence of record to decide if a significant number of jobs exist in the national economy that the claimant remains capable of performing. *Id*. (citing *Burton v. Sec'y of HHS*, 893 F.2d 821, 822 (6th Cir. 1992)). If the presence of a non-exertional limitation, however, does not significantly limit the range of work a claimant may perform, then the Commissioner may nevertheless exclusively rely on the grids to carry his burden of proof. See *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir.

1990) (mental impairment that did not significantly affect the claimant's ability to perform a full range of work at a given exertional level did not preclude reliance on the medical-vocational guidelines).

The grids themselves, even when relied on exclusively, do not per se "determine" disability or non-disability. *See Bohr v. Bowen*, 849 F.2d 219, 220-21 (6th Cir. 1988). At most, the grids when properly applied are a form of administrative determination that substantial gainful activity exists in the national economy for the particular claimant, given his or her age, education, past relevant work and RFC. *Id*. (citing *Kirk v. Sec'y of HHS*, 667 F.2d 524, 535 (6th Cir. 1981), *cert denied*, 461 U.S. 957 (1983)). As the *Bohr* decision aptly describes the role of the grids:

> [T]he grids are a shortcut that eliminate the need for calling in vocational experts. They tell us nothing, however, about the degree of disability and what the residual functional capacity of an individual might be. Because of the very limited function of the grids, we held in *Kirk* that "if the characteristics of the claimant do not *identically* match the description in the grid, the grid is used only as a guideline to disability determination. 667 F.2d at 528 (emphasis added). *Kirk* also teaches that "the grid specifically disclaims an ability to predict disability when nonexertional limitations are the focus of a claimant's impairment." *Id*. at 528. Lastly, *Kirk* commands "that the grid only applies if the individual is capable of performing a wide range of jobs at the designated level - - i.e., sedentary, light or medium." *Id*. at 529.

*Bohr*, 849 F.2d at 221.

Here, ALJ Pickett did not rely solely upon the medical-vocational guidelines to reach his decision at step 5 that Mullalley remains capable of performing alternative substantial gainful activity. Instead, as finding of fact no. 9 indicates, the ALJ merely relied upon the grids as a framework for decision making given his determination in finding of fact no. 3 that

Mullalley has a severe, nonexertional impairment of anxiety. (Tr. 13-17). Rather, ALJ Pickett relied on the testimony of V.E. Stambaugh to reach his decision that Mullalley is not disabled (Tr. 47-53).

Stambaugh testified that assuming that Mullalley was limited to light exertional work of an unskilled nature, she would remain capable of performing the jobs of mail sorter, hand packer and inspector, which Stambaugh explained are all routine, repetitive and unskilled work that does not require interaction with the general public (Tr. 50). If a sit/stand option were to be further assumed, Stambaugh concluded that the number of such jobs available in the state of Kentucky (920; 4,400; and 2,400, respectively) would be reduced by 50% (Tr. 51). During his discussion with V.E. Stambaugh, ALJ Pickett recognized that, given the absence of any transferrable work skills, if Mullalley were limited to a sedentary exertional level of work, she would be found to be disabled based on her age and lack of transferrable skills (Tr. 51).

Mullalley's focus understandably falls on this observation by the ALJ, in light of her hearing testimony concerning her pain-related lifting limitations, as further support for her position that she is disabled due to her limitation to sedentary work. Consideration of a claimant's subjective symptoms such as pain is governed by 20 C.F.R. §§404.1529 and 416.929, along with SSR 96-7p. The cited regulations provide that when the Commissioner considers a claimant's symptoms, including pain, the Commissioner considers the extent to which such symptoms are consistent with the objective medical evidence such as medical signs and laboratory findings as well as other evidence such as medical reports from treating and non-treating sources that discuss the claimant's medical history, diagnosis, prescribed treatment, daily activities, work efforts and the impact of related symptoms on the ability to work. *Id*.

After the claimant's medical signs and laboratory findings show that a medically determinable impairment exists that could reasonably be expected to produce the described symptoms, such as pain, then the Commissioner will evaluate the intensity and persistence of such symptoms to determine the extent to which they limit the claimant's ability to work. 20 CFR § 404.1529(c), 416.929(c). Beyond merely objective medical evidence, which cannot by itself be a basis to reject the intensity and persistence of a claimant's pain, the Commissioner also considers factors such as: a claimant's daily activities; the location, duration, frequency and intensity of his or her pain; any factors that precipitate or aggravate such pain or other symptoms; the type, dosage and effectiveness of any medications the patient has or is taking to alleviate the symptoms; any treatment other than medication the claimant has received for pain or other symptoms; any self-help measures employed by the claimant to reduce his or her symptoms. 20 CFR §416.929(c)(3)(i)-(vi). In considering the above factors, along with the objective medical evidence, the Commissioner also will consider whether any inconsistencies in the evidence exist such as conflicts between the claimant's statements and the rest of the evidence, his or her medical history, signs and laboratory findings and statements to treating and/or non-treating sources about how the alleged symptoms affect the claimant. *Id*.

This procedure for evaluating the subjective symptoms of a claimant has been referred to in the Sixth Circuit as the two-part test of *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). In *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994), the Sixth Circuit explained in this regard that

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the

17

> objectively established medical evidence is of such a severity that can reasonably be expected to produce the alleged disabling pain.

*Id*; *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).

ALJ Pickett at p. 6 of his hearing decision concluded that while Mullalley's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent that they are inconsistent with an RFC for light work (Tr. 16). Specifically, ALJ Pickett concludes that Mullalley's daily activities are not as limited as one would expect given her complaints of disabling pain, in that she remains able to cook, clean, care for herself, do laundry and shop by herself (Tr. 16). The ALJ further noted that despite her complaints of abdominal pain following her hernia surgery in 2007, Mullalley declined to undergo a colonoscopy and CAT scan recommended by her treating physician in order to travel, which in the mind of the ALJ suggested that Mullalley had overstated her pain-related symptoms. Further, the abdominal post-surgical imaging that was performed was noted to reveal no post-operative abnormalities that would corroborate Mullalley's complaints.

As further support for his RFC determination, ALJ Pickett noted that no treating physician has imposed any physical limitations upon Mullalley that would preclude light work, or indicated that she was otherwise disabled. Further, the state agency non-examining physicians, Drs. Mary Payne (Tr. 191-198) and Lisa Beihn (Tr. 227-34), both concluded that Mullalley remains capable of occasionally lifting or carrying up to 20 lbs. and frequently lifting or carrying up to 10 lbs., thereby satisfying the exertional criteria for light work (Tr. 16). Further, the ALJ Pickett found that "any pain related to her hernia has been treated conservatively at the behest of the claimant herself." (Tr. 17).

Independent examination of the administrative record confirms the observations of ALJ Pickett in their entirety. Mullalley has not had significant treatment for complaints of severe pain. At most the medical records contain only isolated, infrequent complaints of abdominal pain. (Tr. 238, 283). She has not been routinely or regularly prescribed medication for chronic, severe pain. (Tr. 126). Her medical treatment in this regard has been infrequent, and certainly conservative, as noted by the ALJ. (Tr. 237-38). When offered the opportunity for further diagnostic imaging to assist in a more specific diagnosis of her generalized abdominal pain complaints, Mullalley voluntarily elected to delay the recommended imaging - - a circumstance that is suggestive of the absence of severe abdominal pain rather than its presence. (Tr. 184, 284).

Mullalley, although somewhat restricted by her abdominal pain, reported a significant range of daily activities that includes cleaning, shopping, driving, doing the laundry, and meal preparation that the non-examining state agency physicians found to be not inconsistent with light exertional work (Tr. 196, 232). Accordingly, while Mullalley certainly may have a condition that can be expected to produce her complaints of abdominal pain, those complaints were properly determined by ALJ Pickett to be exaggerated given her routine activities of daily living, unremarkable diagnostic imaging, infrequent and conservative medical treatment, and the absence of pain medication. ALJ Pickett properly found that Mullalley remains capable to perform light exertional work, and that the medical vocational guidelines apply only as a framework for decision making.

Based on the testimony of the vocational expert, who relied upon a hypothetical by ALJ Pickett that properly took into account Mullalley's age, education, past relevant work

and RFC, the Commissioner carried his burden at step 5 of the sequential evaluation process to identify alternative work that Mullalley remains capable of performing given the limitations caused by her severe impairments. *See Casey v. Sec'y of HHS,* 987 F.3d 1230, 1235 (6th Cir. 1993). For the above reasons, the Magistrate Judge shall recommend that the decision of the Commissioner be **AFFIRMED**.

## RECOMMENDATION

The Magistrate Judge having made findings of fact and conclusions of law recommends that the decision of the Commissioner be **AFFIRMED** and that Mullalley's complaint be dismissed with prejudice.

## NOTICE

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd.*, 474 U.S. 140 (1985). 28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Copies to Counsel of Record